# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                  No. CR 15-4268 JB

RUBEN HERNANDEZ,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

**THIS MATTER** comes before the Court on Defendant's Objection to Presentence Investigative Report, filed August 13, 2019 (Doc. 2801)("Objections"). The primary issues are: (i) whether the 2-level enhancement under § 3A1.1(b)(1) of the United States Sentencing Guidelines Manual (U.S. Sentencing Comm'n 2018)("U.S.S.G." or "Guidelines")[2] for a

---

[1]Defendant Ruben Hernandez withdrew his objections at the sentencing hearing on August 16, 2019. <u>See</u> Notice of Withdrawal of Objections to Presentence Investigative Report, filed August 16, 2019 (Doc. 2813). The Court had, however, already done all the work herein in preparing for the hearing. This Memorandum Opinion and Order preserves the Court's work.

[2]The Supreme Court of the United States of America held in <u>Peugh v. United States</u>, 569 U.S. 530 (2013):

> District courts must begin their sentencing analysis with the Guidelines in effect at the time of the offense and use them to calculate the sentencing range correctly; and those Guidelines will anchor both the district court's discretion and the appellate review process in all of the ways we have described. The newer Guidelines, meanwhile, will have the status of one of many reasons a district court might give for *deviating* from the older Guidelines, a status that is simply not equivalent for *ex post facto* purposes.

569 U.S. at 549 (emphasis in original). The 2018 Guidelines Manual provides, however, that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced" unless doing so "would violate the *ex post facto* clause of the United States Constitution," in which case "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(a)-(b)(1). Defendant Ruben Hernandez aided and abetted

vulnerable victim applies to the calculation of Defendant Ruben Hernandez' total offense level, because the Syndicato de Nuevo Mexico ("SNM") ordered Freddie Sanchez' murder; and (ii) whether the 2-level enhancement under U.S.S.G. § 3A1.3 for restraint of victim applies, because Sanchez was killed in close quarters in his prison cell. The Court concludes that: (i) Sanchez' status as an SNM target imprisoned with SNM members establishes him as vulnerable under U.S.S.G. § 3A1.1(b)(1) by a preponderance of the evidence, but because Hernandez did not know of this vulnerability, the Court sustains this Objection; and (ii) Sanchez was physically restrained in a small, enclosed area in the course of his murder, establishing that he was restrained under U.S.S.G. § 3A1.3 by a preponderance of the evidence, so the Court overrules this Objection.

Hernandez pled guilty to Count 3 of the Superseding Indictment, filed April 21, 2016 (Doc. 368)("Indictment"), on February 1, 2017. See Plea Agreement at 2, filed February 1, 2017 (Doc. 880). Count 3 charges that Hernandez and others "did unlawfully, knowingly, and intentionally murder [Sanchez], in violation of NMSA 1978, Sections 30-2-1 and 30-1-13." Indictment at 15. In his Plea Agreement, Hernandez admits the following facts and declares them true under penalty of perjury:

> In 2007, while incarcerated with the New Mexico Department of Corrections, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture/distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the

---

the murder of Freddie Sanchez in June, 2007, see Superseding Indictment at 15, filed March 9, 2017 (Doc. 947), so the 2006 Guidelines Manual, effective November 1, 2006, would apply to this offense if the Court does not use the current Guidelines Manual, see U.S.S.G. § 1B1.11(b)(3). Using the 2006 Guidelines Manual does not change the result here, so the Court uses the 2018 Guidelines Manual. See U.S.S.G. § 1B1.11(b)(1).

activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2007, I was an active member of the SNM. In June of 2007, I aided and abetted Javier Alonso, a.k.a. "Wineo," Edward Troup, a.k.a. "Huero Troup," Arturo Arnulfo Garcia, a.k.a. "Shotgun," Benjamin Clark, a.k.a. Cyclone and others to murder the person identified in the superseding indictment as F.S., who was an inmate in the Southern New Mexico Correctional Facility (SNMCF) in Doña Ana County. Alonso, Garcia, Troup, Clark, F.S. and I were members of the SNM at the time. On June, [sic] 17, 2007, SNM members Alonso and Troup killed F.S. in his cell, while I covered the camera lens to the camera that could have captured some of the illegal activity. I also served as a lookout in case anyone came. I heard the sound of a struggle followed by silence. Shortly after that I saw Troup walking quickly to his room and Alonso tucking in F.S.'s body in his bed. Clark and Garcia also aided and abetted in the murder.

I did this by virtue of my membership in the SNM and to maintain or increase my position in the SNM.

Thus, in 2007, I aided and abetted the murder of F.S.

Plea Agreement at ¶ 7, at 4. By signing the Plea Agreement, Hernandez "agrees that the Court may rely on any of these facts, as well as facts in the presentence report, to determine the defendant's sentence, including, but not limited to, the advisory guideline offense level." Plea Agreement ¶ 8, at 4-5.

The Presentence Investigation Report, filed August 9, 2019 (Doc. 2795)("Revised PSR"), expounds on the offense conduct, providing:

22.     On June 17, 2007, a correctional officer with the NMCD at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico, was conducting formal count in one of the prison pods when he arrived at the cell belonging to inmate F.S. The officer attempted to have F.S. respond to count; however, when F.S. failed to do so, the officer entered the cell and noticed F.S.'s right hand was pale. The officer attempted to perform first aid but found F.S.'s legs to also be pale. The officer was unable to detect a pulse. Medical personnel at the facility arrived at the pod and found F.S. lying in the prone position with his head facing to the right and with dry blood on his mouth, nose, and on the pillowcase.

23. Investigators with the New Mexico State Police (NMSP) were subsequently assigned to the case and made contact with correctional officers. According to one of the officers, he had an informal interview with F.S. when he arrived at SNMCF on June 14, 2007. During the informal interview, F.S. indicated he had a "hit" on him, and the correctional officers informed the Unit Manager that F.S. would need to be moved for his safety. The correctional officer stated he was surprised when he returned to work two days later and discovered F.S. had not been moved, as this process typically happened immediately.

24. On Monday, June 18, 2007, a sergeant with the NMSP Criminal Investigations Section attended the autopsy of F.S. at the Office of Medical Investigator in Albuquerque, New Mexico. The results of the autopsy and opinion of the medical examiner are that F.S. died of ligature strangulation. The autopsy revealed an abrasion almost completely encircling F.S.'s neck with a slight downward cant on the right posterior neck. The underlying neck muscles showed hemorrhage and bruising, and the cartilage of the neck showed fractures. The manner of death was ruled a homicide.

25. On July 7, 2007, NMSP officers conducted interviews with several witnesses/suspects of the murder of F.S. Specifically, the NMSP officers spoke with **Ruben Hernandez** and Kyle Dwyer, provided the following information about the murder. **Hernandez** indicated his primary role in the murder of F.S. was to obscure the camera lenses located in his pod prior to the murder. He was given instructions by Edward Troup, and although he initially refused, he became fearful for his life; therefore, he complied with Troup's "orders." On the evening of June 16, 2007, **Hernandez** was approached by Troup, who ordered him to cover the lenses immediately. **Hernandez** stated he placed wet paper towels over the lenses and became the "look out" for any prison staff who might enter the pod. **Hernandez** stated he heard F.S. struggling, gasping, and gurgling in his cell, and shortly thereafter, Raymond Rascon and Troup exited F.S.'s cell. **Hernandez** looked into the cell and observed Javier Alonso arranging F.S.'s body in his bed. Troup later ordered **Hernandez** to rearrange F.S. in his bed during the night, as this would give the appearance F.S. had moved around at some point; however, **Hernandez** stated he did not do as instructed. Agents noted **Hernandez** was remorseful of the murder of F.S. throughout the interview.

26. Dwyer initially indicated he did not have any involvement in the murder of F.S. However, he later recanted and stated when he was transferred from the Penitentiary of New Mexico (PNM) in Santa Fe, New Mexico, to the SNMCF, he hand delivered a manila envelope to Benjamin Clark, a.k.a. "Cyclone," who was also incarcerated at SNMCF. According to Dwyer, the envelope contained court documentation that verified F.S. had

cooperated with law enforcement. Dwyer stated he had received the envelope from a correctional officer, who, in turn, had received it from Joe Martinez, an inmate at PNM. Once he arrived at SNMCF, Dwyer gave the envelope to Clark, whom Dwyer believed disseminated it to additional members of the SNM. A few days later, Clark gave the envelope back to Dwyer and stated everyone who needed to see it had seen it and instructed Dwyer to destroy the envelope, which Dwyer did. Dwyer indicated he was transferred back to PNM shortly after the murder of F.S. and was on the bus with Javier Alonso. Alonso showed Dwyer how he could position his arm to make his wrist turn pale while wearing restraints and stated that was how F.S.'s face looked when he (Alonso) was strangling him.

27. In summary, **Hernandez**, an SNM member, was instructed by Troup to cover the camera lens to obstruct the camera view and to serve as a lookout, while F.S. was murdered by other members of the SNM. F.S. was murdered after the SNM received information that F.S. had cooperated with law enforcement officers. Based on the facts of this case, while incarcerated at the SNMCF, two SNM Gang members entered F.S.'s cell and slammed his face on the ground. F.S. was restrained while he was strangled to death with a rope. Due to the close quarters in F.S.'s cell, which had only one entrance and one exit, he was not able to fight off his assailants or escape. Furthermore, F.S. was aware that he had a "green light'' on him and he advised prison officials of said "green light;" however, F.S. was placed with known SNM members who knew F.S. had a "green light" which required them to kill him. Thus, F.S. can be identified as a vulnerable victim. The role of **Hernandez** in the instant offense was minimal, as he was directed by another individual and did not appear to be involved in the planning or organizing of the criminal activity.

Revised PSR ¶¶ 22-27, at 9-11 (bold in original). Hernandez does not object to the United States Probation Office's recitation of the facts; however, he notes that rule 32(e)(2) of the Federal Rules of Criminal Procedure require that the USPO disclose a presentence investigation report "at least 35 days before sentencing unless the defendant waives this minimum period," Fed. R. Crim. P. 32(e)(2), and that he has not waived the minimum period, see Objections at 3. The apparent August 9, 2019, disclosure of the Revised PSR before the scheduled August 16, 2019, sentencing does not meet this thirty-five day minimum period. The Court notes that the recitation of facts provided above has changed from the original Presentence Investigation Report, filed January 22, 2018

(Doc. 1667)("Original PSR"), only in paragraph 27, in which the Revised PSR adds the second through seventh sentences. Compare Revised PSR ¶ 27, at 10-11, with Original PSR ¶ 27, at 11.

Like the Original PSR, the Revised PSR applies a base offense level of 43 under U.S.S.G. §§ 2E1.3(a)(2) and 2A1.1. See Original PSR ¶ 33, at 12; Revised PSR ¶ 33, at 12. The Revised PSR applies two victim-related adjustments for vulnerable victim and restraint of victim; however, the Original PSR applies none. See Original PSR ¶ 35, at 12; Revised PSR ¶¶ 35-36, at 12. Hernandez objects to the application of these two adjustments. See Objections at 4-8. The Revised PSR tracks the Original PSR in decreasing the offense level based on the USPO's finding that Hernandez is a minimal participant, Hernandez' acceptance of responsibility, and Hernandez' assistance to authorities. See Original PSR ¶¶ 36, 40-41, at 12-13; Revised PSR ¶¶ 37, 41-42, at 12-13. Because of the Revised PSR's application of the two victim-related adjustments, it provides a total offense level of 40, whereas the Original PSR's total offense level is 36. See Original PSR ¶ 36, at 13; Revised PSR ¶ 43, at 13.

Hernandez objects to the 2-level enhancement for vulnerable victim under § 3A1.1(b)(1), arguing that Sanchez "was not atypical of the usual target of SNM" and "was able to protect himself," because he had informed a correctional officer of the hit, so he would be moved. Objections at 7. See id. at 8. Hernandez posits that Sanchez "had the means to protect himself, however, the Southern New Mexico Correctional Facility neglected to follow typical procedures to protect" him. Objections at 8. The Court overrules this objection.

The 2-level enhancement for a vulnerable victim applies where the victim of the offense of conviction "is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct," and "the defendant knows or should have known

of the victim's unusual vulnerability." U.S.S.G. § 3A1.1 Application Note 2. The United States

Court of Appeals for the Tenth Circuit has explained that the adjustment should apply where "the

victim is *unusually* vulnerable or *particularly susceptible* to the crime committed," and where the

victims "are unable to protect themselves [and] therefore require greater societal protection."

United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2002)(emphasis in original). The Tenth

Circuit requires the sentencing court to "make an individualized determination; it is not enough

that a victim belongs to a class generally considered vulnerable." United States v. Scott, 529 F.3d

1290, 1300-01 (10th Cir. 2008)(citing United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir.

2002); United States v. Hardesty, 105 F.3d 558, 560 (10th Cir. 1997)). Further, in addition to the

"particularized evidence of a victim's vulnerability, . . . the evidence must also distinguish the

victim as atypical of the usual targets of the relevant criminal conduct." United states v. Caballero,

177 F.3d 1235, 1251 (10th Cir. 2002)(citing United States v. Creech, 913 F.2d 780, 782 (10th Cir.

1990)). In United States v. Tapia, 59 F.3d 1137 (11th Cir. 1995), the United States Court of

Appeals for the Eleventh Circuit reviewed the district court's decision that an incarcerated

government informant, whom other prisoners assaulted, was a vulnerable victim for U.S.S.G.

§ 3A1.1's purposes. See 59 F.3d at 1143. The Eleventh Circuit concluded that there was no error

in the application of the enhancement to the appellants' convictions under 18 U.S.C. § 1513

(retaliating against a witness, victim, or informant), determining that the district court "correctly

concluded that [the victim], as an individual, was particularly vulnerable by virtue of his

incarceration with Appellants and his inability to escape, and that [the victim] was targeted because

of this vulnerability." 59 F.3d at 1143. In United States v. Lambright, 320 F.3d 517 (11th Cir.

2003), the United States Court of Appeals for the Fifth Circuit upheld a U.S.S.G. § 3A1.1

enhancement where a corrections officer killed an inmate.  <u>See</u> 320 F.3d at 518.  The district court concluded that the inmate was a vulnerable victim, because "he was completely dependent upon the care of the correction officers, . . . was locked in his cell prior to the assault, and . . . he could not protect himself from the assault."  20 F.3d at 518.

Trial testimony establishes by a preponderance of the evidence that the SNM targeted Sanchez for his cooperation with law enforcement.  <u>See</u> Transcript of Excerpted Testimony of Benjamin Clark at 49:22-50:1 (taken May 4, 2018)(Beck, Clark), filed May 23, 2018 (Doc. 2307)(stating that Sanchez cooperated with law enforcement); Transcript of Excerpt of Testimony of Billy Cordova at 34:1-2 (taken May 9-10, 2018)(Cordova), filed May 23, 2018 (Doc. 2312)("Cordova Tr.")(stating that Sanchez was a "rat").  The SNM prohibits snitching and issues greenlights, requiring death, on those who break that rule.  <u>See</u> Transcript of Excerpt of Testimony of Leonard Lujan at 12:16-23 (taken April 23-24, 2018)(Beck, Lujan), filed May 16, 2018 (Doc. 2282)("Lujan Tr.")(stating that "the biggest" rule of the SNM is "don't snitch" and that those who do are "going to get hit"); <u>id.</u> at 73:10-12 (Beck, Lujan)(stating that being a rat gets "an automatic green light"); Transcript of Excerpt of Testimony of Manuel Jacob Armijo at 178:2-3 (taken April 26-27, 2018)(Sindel, M. Armijo), filed May 16, 2018 (Doc. 2284)("M. Armijo Tr.")(stating that those who talk to the police can get hit).  Sanchez' greenlight made him particularly vulnerable to being murdered, because, if he survived, SNM would kill those responsible.  <u>See</u> Lujan Tr. at 415:22-24 (Lujan)("If you didn't do it [(follow orders)], then you were going to be the one greenlighted."); M. Armijo Tr. at 184:12-16 (Sindel, M. Armijo)(stating that it is SNM's rule to kill informants and that those who do not kill informants are subject to a hit).  Further, Sanchez' incarceration with other SNM members who knew of the greenlight, were

ordered to act on it, and had easy access to act on it, increased Sanchez' particular vulnerability, which is underscored by Cordova's failed attempt to murder him. See, e.g., Cordova Tr. at 347:3-15 (Castellano, Cordova)(stating that, upon learning Sanchez snitched, Cordova attempted to stab him); Transcript of Excerpt of Testimony of Raymond Rascon at 10:14-24 (May 9, 2018)(Beck, Rascon), filed May 23, 2018 (Doc. 2311)(stating that Troup and Alonso told him to kill Sanchez); Transcript of Excerpted Testimony of Javier Alonso at 27:3-11 (taken May 7, 2018)(Beck, Alonso), filed May 23, 2018 (Doc. 2310)("Alonso Tr.")(stating that Sanchez' paperwork was passed through the pod, which is "[e]ssentially a death sentence," because of the prohibition on snitching). Alonso and Troup targeted Sanchez because of the green light, and because of the threat to their own lives if they did not follow through with it. See Alonso Tr. at 29:24-30:3 (Alonso)(stating that, after seeing Sanchez' paperwork and before Sanchez moved to their pod, Alonso and Troup discussed how to complete the hit on Sanchez if he moved to their pod); id. at 36:14-21 (Alonso)(stating that Guerrero wanted Alonso to make sure the hit occurred and that the Rascon brothers "took care of what they were supposed to do"); id. at 40:23-41:2 (Alonso)(stating that Guerrero said: "Make sure it gets done, or we're going to come in here and get you guys and take you guys out."); id. at 41:9-17 (Beck, Alonso)(stating that, in response to that threat, Alonso met Troup and told him, "[i]t's going down," meaning they were going to kill Sanchez "like right now"); United States v. Pearce, 967 F.2d 434, 435 (10th Cir. 1992)(stating that U.S.S.G. § 3A1.1(b)(1) is justified where "the defendant selected and targeted this particular victim for the [offense] because of unusual characteristics"). Further, Troup and Alonso had easy access to Sanchez, because they were housed in the same pod. See Alonso Tr. at 27:126-18 (Beck, Alonso)(stating that Sanchez did not live in 1-AB pod when Alonso saw his paperwork, but that

Sanchez later moved into that pod); id. at 50:1-8 (Beck, Alonso)(stating that Troup and Alonso lived in 1-AB pod). Troup and Alonso murdered Sanchez in his cell, with Troup distracting Sanchez so Alonso could jump on him from behind, which hampered Sanchez' ability to defend himself or escape. See Alonso Tr. at 42:12-43:19 (Alonso, Beck). Accordingly, the Court determines by a preponderance of the evidence that Sanchez was vulnerable because of the SNM's hit on him, his incarceration with other SNM members who were ordered to act on the hit, and his limited ability to defend himself or escape from the surprise attack in his cell.

Hernandez testified at the trial for Sanchez' murder that he knew about the paperwork that showed Sanchez was "no good." Transcript of Excerpt of Testimony of Ruben Hernandez at 20:2 (taken May 4 and 7, 2018)(Hernandez), filed May 23, 2018 (Doc. 2309)("Hernandez Tr."). See id. at 19:15-20:11 (Beck, Hernandez); id.at 33:5-9 (Beck, Hernandez). Hernandez maintained, however, that he did not know at the time that the paperwork was related to Sanchez, and that Hernandez hoped that the paperwork was not related to himself. See Hernandez Tr. at 60:19-23 (Burke, Hernandez). Hernandez testifed that, after the paperwork came and Sanchez moved into the pod, a meeting occurred among everybody in the pod except for Hernandez and Sanchez. Sanchez was locked in his cell for what is called "orientation," and Jesse Trujillo stopped Hernandez' attempt to go to the meeting. Hernandez Tr. at 33:14-34:17 (Beck, Hernandez). Hernandez believed the meeting was about him because he had snitched on somebody in the past and anticipated that the SNM would find out that he snitched. See Hernandez Tr. at 35:7-14 (Beck, Hernandez). At some point on June 16, 2017, the day of Sanchez' murder, Trujillo asked Hernandez to cover the cameras, and Hernandez complied. See Hernandez Tr. at 74:20-75:4 (Beck, Hernandez). Hernandez said that, after Trujillo told him to uncover the cameras, he did so

and then went back to his cell, and, on the way, saw what appeared to be Alonso tucking in Sanchez in bed.  See Hernandez Tr. at 44:11-45:7 (Beck, Hernandez).  There is no evidence from either the PSR, the Plea Agreement, or the trial indicating that Hernandez knew Sanchez was the target of the hit or that he was vulnerable until after the murder.  The Court therefore cannot determine by a preponderance of the evidence that Hernandez knew, or should have known, that Sanchez was the victim and that he was vulnerable.  If Hernandez did not have this requisite knowledge, then U.S.S.G. § 3A1.1(b)(1) cannot apply.  See U.S.S.G. § 3A1.1(b)(1).  Accord United States v. Bailey, 405 F.3d 102, 113 (1st Cir. 2005)(stating that imposing § 3A1.1(b)(1) requires the sentencing court to make two determinations by a preponderance of the evidence: (i) whether the victim was vulnerable; and (ii) whether the defendant knew or should have known of the victim's vulnerability).  The Court accordingly sustains Hernandez' Objection and will not apply the 2-level enhancement under U.S.S.G. § 3A1.1(b)(1).

Hernandez also objects to the 2-level enhancement under U.S.S.G. § 3A1.3, arguing that he "did not admit to the restraining or even knowing of the restraining of F.S. during the plea colloquy."  Objections at 4.  He asserts that he "initially did not realize that [a] violent crime was being committed but at some point after hearing the struggle and the gurgling he realized that a serious aggravated assault was occurring."  Objections at 4.  Hernandez also maintains that "[m]urder is the ultimate restraint" and that "[s]uch terminal restraint is simply an element of the crime of homicide."  Objections at 5 (citing United States v. Mikaljunas, 936 F.2d 153, 156 (4th Cir. 1991)).

U.S.S.G. § 3A1.3 applies where the "victim was physically restrained in the course of the offense."  U.S.S.G. § 3A1.3.  The Guidelines Manual counsels that the restraint-of-victim

enhancement does not apply "where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself."  U.S.S.G. § 3A1.3 Application Note 2.  The Guidelines Manual defines the term "physically restrained" as "the forcible restraint of the victim such as being tied, bound, or locked up."  U.S.S.G. § 1B1.1 Application Note 1(L).  These examples "are merely illustrative and not exhaustive."  United States v. Rodella, No. CR 14-2783, 2015 WL 711941, at *27 (D.N.M. Feb. 5, 2015)(Browning, J.)(citing United States v. Checora, 175 F.3d 782, 790 (10th Cir. 1999)).  The Tenth Circuit has advised that the restraint-of-victim enhancement applies where "there [is] a forcible restraint of a victim which occurs during commission of the offense."  United States v. Checora, 175 F.3d at 790 (footnote omitted).

The Court concludes that, apart from the restraint inherent in strangulation and, as Hernandez argues, murder, the trial testimony establishes by a preponderance of the evidence that Sanchez was physically restrained in the course of his murder.  See United States v. Baumann, 60 F. App'x 63, 64 (9th Cir. 2003)(unpublished)(upholding district court's application of § 3A1.3 where it applied the enhancement, not because of the victim's strangulation, but because of the defendant's "forcible confinement of [the victim] to the bathroom and his pinning her to the bathroom floor in a manner that prevented her escape").  Alonso, who physically strangled Sanchez, testified that, after he slammed Sanchez to the ground, Troup held the bottom of Sanchez' body, while Alonso strangled him.  See Alonso Tr. at 43:18-23 (Alonso).  Clark testified to what Troup told him had occurred: that Alonso grabbed Sanchez, threw him to the floor, and stood on his back to strangle him, while Troup fell on Sanchez' legs.  See Transcript of Excerpted Testimony of Benjamin Clark at 57:13-15 (taken May 4, 2018)(Clark), filed May 23, 2018

(Doc. 2307). While these testimonies are slightly different, the Court notes that Alonso was present at the murder while Clark was not present, and the Court must always scrutinize hearsay evidence, to which Clark testified, with caution. Clark's testimony about what Troup said, however, supports Alonso's testimony that Alonso slammed Sanchez to the floor. Alonso's slamming Sanchez to the floor to facilitate the strangulation by keeping Sanchez under his control and to impede his movement is physical restraint. See United States v. Checora, 175 F.3d at 791 (stating that restraint occurs where the defendant takes an action to "prevent the victim from doing something" or to "keep the victim within bounds or under control"). Further, the Court credits Alonso's testimony that Troup held Sanchez' lower body, which is also physical restraint. See United States v. Ivory, 532 F.3d 1095, 1106 (10th Cir. 2008)(upholding the enhancement's application where the defendant acted to "trap or immobilize" the victim). Accordingly, the Court determines that Sanchez was physically restrained in the course of his murder.

This physical restraint is separate from the terminal restraint inherent in murder to which Hernandez points. See Objections at 5. Hernandez also asserts that the Guidelines' examples of physical restraint imply that § 3A1.3 should apply where there is "more than a brief hold while in commission of the crime." Objections at 6. Even if this argument were true, slamming Sanchez to the ground and holding his lower body qualify as "more than a brief hold," Objections at 6, and are actions calculated to immobilize Sanchez and to keep him under Alonso's control as Alonso strangled him, which is sufficient for the enhancement's application, see United States v. Ivory, 532 F.3d at 1106; United States v. Checora, 175 F.3d at 791. Further, § 3A1.3 has no knowledge element like § 3A1.1(b)(1). Compare U.S.S.G. § 3A1.3, with § 3A1.1(b)(1). U.S.S.G. § 3A1.3 states in full: "If a victim was physically restrained in the course of the offense, increase by **2**

levels." U.S.S.G. § 3A1.3 (bold in original). Accordingly, all that is required for the application

of this enhancement is that Sanchez was "physically restrained in the course of" his murder.

U.S.S.G. § 3A1.3. As the USPO notes in the Addendum to the Presentence Report, filed August

15, 2019 (Doc. 2806)("Addendum"), the adjustments applicable to Hernandez may be determined

by:

> (1)    (A)    all acts and omissions committed, aided, abetted, counseled,
>        commanded, induced, procured, or willfully caused by the defendant; and
>        (B)  in the case of a jointly undertaken criminal activity (a criminal plan,
>        scheme, endeavor, or enterprise undertaken by the defendant in concert with
>        others, whether or not charged as a conspiracy), all acts and omissions of
>        others that were --
>
> > (i)    within the scope of the jointly undertaken criminal activity,
> >
> > (ii)   in furtherance of that criminal activity, and
> >
> > (iii)  reasonably foreseeable in connection with that criminal
> >        activity;
>
> that occurred during the commission of the offense of conviction, in
> preparation for that offense, or in the course of attempting to avoid detection
> or responsibility for that offense . . . .

U.S.S.G. § 1B1.3(1). Hernandez pleaded guilty to aiding and abetting Sanchez' murder, and is

therefore responsible for this physical restraint. Accordingly, the Court will apply U.S.S.G.

§ 3A1.3's 2-level enhancement and overrule Hernandez' Objection.

Without U.S.S.G. § 3A1.1(b)(1)'s application, and with U.S.S.G. § 3A1.3's application,

Hernandez' total offense level is 38. Hernandez does not object to the Revised PSR's calculated

criminal history score of 16 and criminal history category of VI. See Revised PSR ¶ 60, at 21;

Objections at 1-8. With a criminal history category of VI and a total offense level of 38, the

Guideline imprisonment range is 360 months to life, which is the same as the Revised PSR's

Guideline imprisonment range.  See Revised PSR ¶ 97, at 27.  The Original PSR, however, without the application of either victim-based adjustment, provides a Guideline imprisonment range of 324-405 months.

**IT IS ORDERED** that: (i) the Defendant's Objection to Presentence Investigative Report, filed August 13, 2019 (Doc. 2801), is overruled in part and sustained in part; (ii) the Objection to U.S.S.G. § 3A1.1(b)(1) is sustained; (iii) the Objection to U.S.S.G. § 3A1.3 is overruled; and (iv) Defendant Ruben Hernandez' total offense level is 38.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
    Attorney for the United States
        Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
    Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

    *Attorneys for the Plaintiff*

Sarah M. Gorman
Law Offices of Robert D. Gorman
Albuquerque, New Mexico

    *Attorney for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

 *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

 *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

 *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

 *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

*Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Joseph E. Shattuck
Marco & Shattuck
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

*Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Eduardo Solis
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

*Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

      *Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

      *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

      *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias Attorney at Law
Albuquerque, New Mexico

      *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

      *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and--

Ray Velarde
El Paso, Texas

     *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Richard Jewkes
El Paso, Texas

--and--

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

      *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Brusuelas-Benavidez
Albuquerque, New Mexico

      *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

      *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

      *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

      *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

      *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

--and--

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C.
Corrales, New Mexico

      *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

>    *Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

>    *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

>    *Attorney for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

>    *Attorney for Defendant Shauna Gutierrez*

Alfred D. Creecy
Albuquerque, New Mexico

--and--

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

>    *Attorneys for Defendant Brandy Rodriguez*